# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **CYNTHIA G. WILCOX,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 02-1455 (RMC)** |
| | ) | |
| **CHARLES SISSON, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OPINION ON FEE APPLICATION

The Court previously awarded Cynthia Wilcox $847,224.46 in damages, plus reasonable attorneys' fees in an amount to be determined, to give her the benefit of her bargain for a breach of contract committed by Charles Sisson when he constructed and sold her the residence at 4815 Dexter Street N.W. in Washington, D.C. *Wilcox v. Sisson*, No. 02-1455, Memorandum Opinion ("Mem. Op.") at 1 (D.D.C. Feb. 4, 2005), *aff'd*, No. 05-7038 (D.C. Cir. Feb. 14, 2006) (unpublished). The frauds that breached the contract of sale are detailed in the Court's previous opinion and need not be repeated here.

Plaintiff now moves, in her Application for Attorneys' Fees and Costs ("Pl.'s App.") [Dkt. #120], and her First and Second Supplements[1] to that application [Dkt. ##126, 163], for an award of $816,198.93 in attorneys' fees and associated expenses pursuant to an express provision in the Sales Agreement.[2] For the reasons explained below, the Court will grant Ms. Wilcox's fee

---

[1] Plaintiff's Third Supplement to her fee application [Dkt. #204] will be addressed in a later decision.

[2] Paragraph 23 of the Sales Agreement specifies:

**ATTORNEY'S FEES**. In any action or proceeding involving a

application in large part, and will award her $775,319.83 in attorneys' fees.

## I. FACTUAL BACKGROUND

This matter has been fully contested at every turn by Mr. Sisson.  He first avoided

service.[3]  After years in fractious discovery and trial preparation, the case was tried to the Court

between August 18 and August 26, 2004.  Both parties have now fully briefed the issues concerning

the amount in attorneys' fees and costs that should be awarded.  Mr. Sisson argues that Ms. Wilcox's

request for $816,198.93 in fees should be reduced by at least $219,628.19 to reflect "the prevailing

rate of attorneys' fees in the District of Columbia for similar work," and suggests that it be further

reduced because: a smaller, less expensive firm could have been used; counsel made no attempt to

control costs; the fee statements are insufficiently specific; and Ms. Wilcox made no effort to settle

without resort to litigation.  Defendants' Opposition to Plaintiff's Application for Attorneys' Fees

and Costs ("Defs.' Opp'n") at 16.

Ms. Wilcox retained Williams and Connolly LLP of Washington, D.C., to represent

her in this matter.  The partner in charge is Gerson A. Zweifach.  Mr. Zweifach graduated from

---

dispute between the Purchaser and the Seller arising out of this
Contract, the prevailing party will be entitled to receive from the
other party reasonable attorney's fees to be determined by the court
or arbitrator(s).  In the event a dispute arises resulting in the Broker
being made a party to any litigation or if the Broker is required to
bring litigation to collect the Broker's Fee, the Purchaser and Seller
agree to indemnify the Broker, the employees, and/or licensees for all
attorney fees and costs of litigation, unless the litigation results in a
judgment against the Broker, its employees and/or licensees.

[3] *See* Pl.'s App. Exh. D (reporting that a process server tried for five days to effect service
but "Mr. Sisson refused to come to the door" until he waited outside from 3 p.m., when Mr. Sisson
did not answer the door, until 5:45 p.m., when Mr. Sisson came out to retrieve his mail and was
served).

Brown University with an A.B. degree in 1975, *magna cum laude* and Phi Beta Kappa.  He graduated from Yale Law School in 1979.  After his law school graduation, he clerked for Judge Pierre N. Leval on the District Court for the Southern District of New York and then for Judge David L. Bazelon on the Court of Appeals for the D.C. Circuit.  Mr. Zweifach has practiced civil litigation at Williams & Connolly for over 23 years.  In 2002, Mr. Zweifach's hourly rate was $475; it increased to $515 in 2003 and to $550 in 2004.  A single associate, Manish K. Mital, worked on the case.[4]  Mr. Mital graduated from the Massachusetts Institute of Technology and Harvard Law School, *magna cum laude*.  He became associated with Williams & Connolly upon his graduation from Harvard Law School in 2000.  Mr. Mital's hourly billing rate was $215 in 2002, $255 in 2003, and $295 in 2004.  Ms. Wilcox was billed, and paid Williams and Connolly, at these rates.

More than 80% of the hours billed to this matter by Williams and Connolly represent hours worked by Mr. Mital rather than Mr. Zweifach.  *See* Pl.'s App. Exh. A (Zweifach Affidavit), Attach. 3 (demonstrating that Mr. Mital billed 1,696 hours and Mr. Zweifach billed 383.25 hours to the case).[5]

## II. LEGAL STANDARDS

"The usual method of calculating reasonable attorneys' fees is to multiply the hours reasonably expended in the litigation by a reasonable hourly fee, producing the 'lodestar' amount."

---

[4] A second associate, M.E. Hills, billed a small amount of time to the matter when it was first filed in the Eastern District of Virginia, where Mr. Sisson resides.  However, the case was transferred to this Court over Ms. Wilcox's objections and she is not seeking to recover the fees or costs associated with resisting transfer from Virginia.  Pl.'s App. Exh. A ¶ 4.

[5] The first page of the Attachment, which reflects these numbers, is stamped CW03000.  Three summer associates who collectively spent 59.50 hours working on the matter were not billed at all.  Pl.'s App. Exh. A ¶ 4.

*Board of Trustees of the Hotel & Restaurant Employees Local 25 v. JPR Inc.*, 135 F.3d 794, 801 (D.C. Cir. 1998). "This amount may then be adjusted by a multiplier in certain rare and exceptional cases, although there is a strong presumption that the lodestar figure . . . represents a reasonable fee." *Id.* (internal quotation marks omitted). The "lodestar" approach to fee awards was established by the Supreme Court in *Hensley v. Eckerhart*, 461 U.S. 424 (1983), and is the approach followed by the federal courts in most fee award disputes. *See Gisbrecht v. Barnhart*, 535 U.S. 789, 802 (2002) ("Thus, the lodestar method today holds sway in federal-court adjudication of disputes over the amount of fees properly shifted to the loser in the litigation."). Federal courts rely on the lodestar method to calculate fees without regard to whether the award would exceed a contingent-fee agreement between client and counsel. *Blanchard v. Bergeron*, 489 U.S. 87, 93 (1989); *see also Venegas v. Mitchell*, 495 U.S. 82 (1990). The fee applicant bears the burden of demonstrating that the claimed rate and number of hours are reasonable. *Blum v. Stentson*, 465 U.S. 886, 897 (1984).

A. Rates

"[T]he burden is on the fee applicant to produce satisfactory evidence — in addition to the attorney's own affidavits — that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stetson*, 465 U.S. 886, 895 n.11 (1984). "A rate determined in this way is normally deemed to be reasonable, and is referred to — for convenience — as the prevailing market rate." *Id.* Given the variation in attorneys' skills and experiences, it is anticipated that the "market rate" for established practitioners will be higher than that for younger lawyers. *See id.* The market generally accepts higher rates from attorneys at firms with more than 100 lawyers than from those at smaller firms — presumably because of their greater resources and investments, such as attorneys,

librarians, researchers, support staff, information technology, and litigation services.  *See* Pl.'s App.

Exh. C (Helder Associates' 2004 Law Firm Billing Rate Survey).[6]  The rates charged by counsel for

the winning party are presumptively reasonable if they are the same rates that counsel customarily

charge other fee-paying clients for similar work.  *Cobell v. Norton*, 231 F. Supp. 2d 295, 302-03

(D.D.C. 2002) ("There is no better indication of what the market will bear than what the lawyer in

fact charges for his services and what his clients pay."); *see also Martini v. Fed. Nat'l Mortg. Ass'n*,

977 F. Supp. 482, 485 (D.D.C. 1997).

Reasonable attorneys' fees include charges for legal assistants and law clerks.

*Missouri v. Jenkins*, 491 U.S. 274, 285 (1989) ("Thus, the fee must take into account the work not

only of attorneys, but also of secretaries, messengers, librarians, janitors, and others whose labor

contributes to the work product for which an attorney bills her client; and it must also take account

of other expenses and profit.").  Various forms of litigation expenses that are not fees for attorneys'

time — such as copying charges, court reporter fees, and data research — are also to be included in

the award if such expenses are routinely billed by the attorney to his or her client.  *See New York v.*

*Microsoft Corp.*, 297 F. Supp. 2d 15, 48 (D.D.C. 2003).

B. Hours

A fee applicant may satisfy its burden of demonstrating that its time was reasonably

spent by submitting " 'sufficiently detailed information about the hours logged and the work done'

that permits the district court to 'make an independent determination whether or not the hours

---

[6] These relatively high hourly rates may also be acceptable to the marketplace because such firms more frequently attract superior young lawyers such as Mr. Mital, the associate on this case, who graduated *magna cum laude* from Harvard Law School.  *See* Transcript 8/18/04 a.m. at 43 (counsel for Mr. Sisson commenting to Ms. Wilcox, "your money was well spent").

claimed are justified.' " *Cobell*, 231 F. Supp. 2d at 306 (quoting *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1327 (D.C. Cir. 1982)).  The application need not, however, "present the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney." *Id.*

"Billable hours in fee applications are susceptible to reduction for failure to allocate tasks efficiently to different attorneys based on experience," for example, where research tasks are performed by relatively senior attorneys more frequently than seems justifiable, or where some attorneys' efforts seem to have been needlessly duplicated by others.  *Id.* at 761.  "Hours may also be rejected when work descriptions are so general that a court cannot ascertain the reasonableness of the time claimed." *Id.* at 762.

If the Court determines that duplication or waste of effort has occurred, it has the discretion to "simply reduc[e] the proposed 'lodestar' fee by a reasonable amount without performing an item-by-item accounting." *LaPrade v. Kidder Peabody & Co.*, 146 F.3d 899, 908 (D.C. Cir. 1998).  The Court may also "in some circumstances consider a fee request, or a particular item within a fee request, so 'outrageously unreasonable' that outright denial of the request or an item within the request would be appropriate." *Id.*

Neither party seriously contests any of these legal guideposts.[7]

### III. DISCUSSION

Ms. Wilcox prevailed in the underlying litigation and is entitled to an award of attorneys' fees pursuant to the express terms of her contract of sale with Mr. Sisson.

---

[7] *Cf.* Part II.C, *infra* at 16.

A.  Reasonableness of the Rates Charged

The relevant time frame for determining the market rate in Washington, D.C., for trial preparation and trial itself spans the years 2002, 2003, and 2004.  For 2003, Ms. Wilcox submits data from the *National Law Journal* that extracts the ranges of partner and associate hourly rates for law firms across the United States as reflected in bankruptcy court filings.  For 2004, she submits the national Attorney Billing Rate Survey conducted by Helder Associates.  Both data sources allow one to focus on law firms located in the District of Columbia.

Mr. Sisson challenges the Williams & Connolly rates on a number of bases.  First, he argues that he could "not have anticipated" that Ms. Wilcox would go to "the same law firm that represents General Electric, American Airlines, and 3M to file a lawsuit against him for defects in a private home."  Defs.' Opp'n at 1.  Further, he "could never have imagined that Ms. Wilcox would spend such a vast sum on attorneys' fees for a case such as this."  *Id.* at 1-2.  These arguments must fail, as they are irrelevant to the questions whether the hourly rates charged for Messrs. Zweifach and Mital were reasonable and whether the hours expended were reasonable.  Having agreed to pay attorneys' fees should he lose any litigation arising from the contract of sale, Mr. Sisson has no basis to challenge Ms. Wilcox's choice of counsel.  The time to have limited either party in their choice was at the time of contract formation.  Having left the matter open, Mr. Sisson cannot now complain.

Mr. Sisson next argues that the fees charged by Williams & Connolly were much higher than the "rate prevailing in the community for similar work."  *Planells v. Howard Univ.*, 34 FEP Cases 66, U.S. Dist. LEXIS 19338, at *6 (D.D.C. 1984) (*citing Copeland v. Marshall*, 641 F.2d 880, 892 (D.C. Cir. 1980)); *see* Defs.' Opp'n at 2.  Referring to the Helder Associates survey, *see* Pl.'s App. Exh. C at 72, he argues that in 2004 fewer than 8.6% of partners in law firms with more

than 100 attorneys charged at a rate equal to or greater than that of Mr. Zweifach.  Mr. Sisson then averages the hourly rates charged by all partners, at law firms of all sizes, who responded to the Helder Associates survey, to contend that the 2004 prevailing hourly rate for partners in D.C. was actually $357.28.  He thus submits that Mr. Zweifach's rate should be adjusted accordingly, and his fees reduced by 35%, from $202,815.00 to $131,829.75.  Defs.' Opp'n at 4.

Following the same logic, Mr. Sisson also seeks a reduction in fees for the time charged by Mr. Mital.  He points out that Mr. Mital's billing rate in 2004 — $295 per hour — was ten dollars higher than the average for associates in his class year working in firms with over 100 attorneys, according to the Helder Associates survey.  *See* Pl.'s App. Exh. C at. 76.  Of those associates in large D.C. firms who reported to the survey, nine charged more per hour than Mr. Mital and twenty-six charged less.  Defs.' Opp'n at 4.  Mr. Sisson notes that the average hourly rate for associates at all reporting law firms in 2004 was $216.  *Id.* at 5.  Applying this rate to Mr. Mital's time, he seeks a 26% reduction in total charges, from $457,490 to $338,542.60.

Mr. Sisson's approach to calculating the local marketplace for attorney services must be rejected.  He would average the hourly rates charged by all partners at all law firms who reported to the 2004 Helder Associates survey and apply the resulting comparison to Williams & Connolly's 2004 rates, and would then use that difference to apply to all years in question.  His approach does nothing to identify the appropriate lodestar for use here.  The Helder Associates survey reveals clearly that the marketplace tolerates and pays higher hourly rates to lawyers — partners and associates — in large law firms of more than 100 lawyers.  Williams & Connolly has more than 200 lawyers.  Pl.'s App.  Exh. A ¶ 4.  It does not practice in the same marketplace as smaller firms that

charge less per hour.  The comparison Mr. Sisson urges is inapt.[8]

Here, more than 80% of the hours billed reflect work by a junior associate, who billed at significantly lower rates than any partner at many firms.  Given its familiarity with the numerous motions, briefs, arguments, discovery disputes, and the bench trial itself, the Court readily finds that Mr. Mital performed in an exemplary manner equal to lawyers many years his senior.  Ms. Wilcox's reliance on Mr. Mital was not only efficient, it was effective.  Although his rate might have hovered at the high end of the spectrum for associates of his year in the District of Columbia, his value to the case cannot be gainsaid.  Through counsel, Mr. Sisson himself admitted to Ms. Wilcox that she had been well represented.  Ms. Wilcox obviously agreed, because she has paid the fee statements from Williams & Connolly.  The Court concludes that the fees charged for Mr. Mital's work are reasonable for associates of his caliber in the District of Columbia .

The Court likewise finds no reason to question the rates charged by Williams & Connolly for Mr. Zweifach's time on this case.  At all times, Mr. Zweifach's hourly rate has been within the range for partners in D.C. law firms of 100 attorneys or more.  Moreover, Mr. Zweifach, who is the billing partner on the matter, wrote off $152,765 from the bills actually submitted to Ms. Wilcox.[9]  Thus, the effective rates charged to Ms. Wilcox were lower than the stated rates by 22%.

---

[8] Mr. Sisson bases his argument in part on the nature of this case.  He asserts that this was a straightforward house-defect case and that it did not take sophisticated lawyering (presumably of the kind Williams & Connolly is normally required to apply).  Defs.' Opp'n at 1.  While this point will be elaborated below, under the reasonableness of the hours expended, the Court will note here that Mr. Sisson's actions — in relation to the construction of the Dexter Property and in conducting this litigation — transformed this case into anything but straightforward.

[9] *See* Pl.'s App. Exh. A Attach. 2 at CW 2038, 2044, 2051, 2058, 2065, 2083, 2091, 2100, 2107, 2116, 2136, 2145, 2155, 2164, 2172, 2182, 2191, 2198, 2207, 2214, 2221, 2226, 2245, 2260.

Given this exercise in billing judgment, the Court will not further lower Mr. Zweifach's rates and finds that they are reasonable for partners of his experience and skill at firms of greater than 100 lawyers in Washington, D.C.

### B.  Reasonableness of the Hours Expended

This lawsuit started with Mr. Sisson evading the process server until service was accomplished in April 2002 only by the process server's remaining in front of Mr. Sisson's residence until he ventured outside.  Mr. Sisson next filed a successful motion to transfer venue from the Eastern District of Virginia, where suit was filed, to this Court.  He then moved to dismiss the federal case so that it could be consolidated with an action pending in D.C. Superior Court between Mr. Sisson and Dana Preister, the builder of the Dexter Property, although that action had already been tried.  *See* August 16, 2003, Renewed Motion to Dismiss [Dkt. #4].  Mr. Sisson "relied" on the pendency of that motion to justify his refusal to respond to discovery throughout 2002, even after Judge Richard Leon, to whom the case was then assigned, denied his request for a stay in December 2002.  The case was transferred to the undersigned in January 2003.  At that time, the docket reflected Mr. Sisson's motion to dismiss; Mr. Sisson's motion to strike; Ms. Wilcox's motion to compel discovery and for sanctions; Mr. Sisson's motion for a protective order; and Ms. Wilcox's motion for a status conference, each of which was opposed and fully briefed.  By order dated February 27, 2003, the Court denied Mr. Sisson's motions, clarified that he had an obligation to respond immediately to outstanding discovery, and set a March 2003 status conference.

As of that status conference, Mr. Sisson had yet to provide any discovery to Ms. Wilcox.  Instead, Mr. Sisson asked that the Court continue to delay entry of a scheduling order to enable him to serve third-party complaints and depose six of his own subcontractors to decide

whether to add them to this suit.  The Court ordered that all third parties be joined by April 7, 2003, so that a scheduling order could be issued, and the scheduling conference was continued for that purpose.  Mr. Sisson then filed but did not serve the third-party complaints, making the follow-up scheduling conference a useless exercise.  He never deposed any subcontractors.  He eventually served three third-party defendants but the Court dismissed two of them on summary judgment and dismissed most of the claims against the third.  The point of this history lesson is that Mr. Sisson expanded the case without merit, caused significant delay, and added to the expense for Ms. Wilcox.

Mr. Sisson filed three motions to dismiss this lawsuit before he responded to discovery.  He first filed a motion to dismiss while the case was still in Virginia.  Upon transfer to the District, he filed a renewed motion to dismiss in August 2002.  Shortly after this was denied in February 2003, Mr. Sisson filed a third motion to dismiss on April 2, 2003, raising many of the same arguments.  None of his motions was found to have merit, but all had to be fully briefed by Ms. Wilcox's counsel and decided by the Court.

The Complaint here was filed on April 23, 2002, against Charles E. Sisson and the Sisson Trust.  Mr. Sisson filed his Answer on Mar. 17, 2003.  As the record reveals, certain of his asserted defenses had no basis in fact: he denied any personal responsibility for the construction or sale of the residence to Ms. Wilcox and attributed its ownership to the Sisson Trust, *id.* ¶ 10; denied that the Dexter Property had been marketed as "newly constructed," *id.* ¶ 12; denied providing a final inspection approval to Ms. Wilcox, *id.* ¶ 17; denied that the Dexter Property had any defects, *id.* ¶ 23; denied that there were deviations from building permits, *id.* ¶¶ 60-63; and denied the existence of any structural defects, *id.* ¶¶ 42-56.  In fact, the Sisson "Trust" was a sham that never counted the Dexter Property among its assets; Mr. Sisson acted as his own general contractor and selected the

subcontractors; the marketing brochure proclaimed in writing that the house was newly constructed; Mr. Sisson advanced a counterclaim against Ms. Wilcox in the same document as his Answer on the premise that she owed him escrow monies because he had provided a final inspection approval; Mr. Sisson had earlier sued Mr. Preister, his contractor, because of defects in the construction; there were no permits of any kind for the third floor added to the house; and there were some 18 crucial structural defects, Mem. Op. at 24-29, some of which were obvious to the naked eye.  While a defendant need not confess liability in his answer, the nature of Mr. Sisson's Answer imposed a difficult and time-consuming discovery burden on Ms. Wilcox to demonstrate the truth of certain facts that were not subject to legitimate question.

Mr. Sisson's counterclaims had no merit but required full briefing prior to dismissal. In one, he alleged that Ms. Wilcox was liable to him because she had hired an incompetent home inspector, who might have given Mr. Sisson better warning of defects. *Id.* ¶¶ 33-37.  He alleged that Ms. Wilcox had breached the escrow agreement by not releasing funds to him, even though he admitted at trial that he never completed all of the repairs required by the escrow agreement.  *Id.* ¶¶ 26-32; Transcript 8/20/04 a.m. at 203-04.  With real *chutzpah*, Mr. Sisson alleged that Ms. Wilcox had committed an abuse of process by joining him as a personal defendant when she allegedly knew that there was an "insufficient evidentiary basis" to pierce the veil on the Sisson Trust, which supposedly owned the Dexter Property and sold it to Ms. Wilcox.  Answer ¶¶ 38-42; Defs.' Opp'n to Pl.'s Mot. to Dismiss Counterclaims at 11-12 [Dkt. #39].  After extraordinary efforts to extract the documents and information from Mr. Sisson and third parties relating to the Trust, it is now clear that there was never any basis to assert that the Trust existed at all.  The Trust never had a Trustee; it never held the Dexter Property; its funds were routinely used by Mr. Sisson for personal purposes;

and Mr. Sisson had admitted under oath in his lawsuit against Mr. Preister in Superior Court that Mr. Sisson, not the Trust, sold the Dexter Property to Ms. Wilcox.  Proving that the Trust was a sham took inordinate discovery efforts.  Mr. Sisson failed to provide requested documentation and then produced undisclosed checks and other records as he came into his deposition.  Williams & Connolly engaged in considerable third-party discovery to learn the truth about the Trust because of Mr. Sisson's failures to respond timely to discovery and respond accurately to questions.

The entire discovery process took more time and more effort than this allegedly straightforward case should have required.  The fault for this delay falls squarely on the defendants. For example:

- When Mr. Sisson finally responded to Ms. Wilcox's discovery, he flatly refused to provide any information about the Trust.

- When Mr. Sisson finally responded to Ms. Wilcox's discovery, he ignored this Court's order to produce documents immediately and, in fact, produced no documents.

- After a telephonic status conference on discovery, and the Court's second order to Mr. Sisson to produce documents (more than a year after the complaint was filed), he produced a handful of documents related to the Trust, with no checks, no bank records, and no list of Trust assets.

- At his deposition, Mr. Sisson brought with him a plastic bag full of previously undisclosed checks relating to one of the Trust's accounts and admitted that the Trust had a second, previously unrevealed account for which he brought no records.

Similar conduct permeated discovery in this case.  Counsel for Ms. Wilcox repeatedly sent letters to Mr. Sisson demanding responses to her discovery; were forced to take a second day of deposition testimony from him because of belated revelations; and had to engage in expensive third-party discovery of various financial institutions and individuals to obtain the Trust's financial records. Ultimately, Ms. Wilcox's lawyers spent close to 200 hours researching and briefing Trust-related issues and pursuing and obtaining Trust-related discovery from Mr. Sisson and third parties, not including direct review and analysis for purposes of trial.  *See* Pl.'s App. Exh. A Attach. 3.[10] Because these hours were forced by Mr. Sisson's own conduct, he cannot now complain of the time that this took.

Counsel for Ms. Wilcox also spent hours obtaining and reviewing records and testimony from the litigation between Mr. Sisson and Mr. Preister for purposes of deposing Mr. Preister.  This effort proved worthwhile when it revealed that Mr. Sisson had not truthfully testified in this Court about his intentions in buying the Dexter Property, his history of serving as his own general contractor on housing renovation projects, his oversight of the Dexter Property construction, his knowledge of problems with that construction, and the nature of the Trust.  *See* Mem. Op. at 36-40 (finding that Mr. Sisson was not a credible witness).  The costs of developing this impeachment material should be borne by the party whose misrepresentations made the work necessary.

---

[10] Mr. Sisson complains that the Williams & Connolly fee statements do not clearly delineate the time spent on each task.  The Court finds that the fee statements are more than adequate for the purpose.  Mr. Zweifach has submitted the firm's invoices to Ms. Wilcox as Attachment 2 to his declaration.  *See* Pl.'s App. Exh. A.  The complete time worked by all attorneys and staff persons is reflected in contemporaneously recorded time entries, attached as Attachment 3 to the declaration. A separate breakdown of the time spent by Mr. Mital and by Mr. Zweifach is reflected in Attachment 4 to the declaration.

Mr. Sisson's approach to discovery also increased the charges incurred by Ms. Wilcox for paralegal support. First, his documents were produced in no order whatever and had to be reviewed and organized to be useful. Pl.'s App. Exh. B (Mital Decl.) ¶ 5. When he brought hundreds of Trust checks to his deposition, four paralegals spent the morning organizing and copying them so that he might be questioned that afternoon. *Id.* ¶ 4. During expert discovery, Mr. Sisson first failed to produce his expert files and then produced only the originals, forcing Ms. Wilcox to shoulder the charges and the burden of making copies on a rush basis.[11]

Williams & Connolly staffed this case quite leanly and, for much of the pretrial effort, Mr. Zweifach simply guided Mr. Mital's work by way of short meetings between them. Mr. Mital conducted almost all of the factual investigation, developed all expert testimony, attended to all communications with third-party defendants and their counsel, pursued all third-party discovery, handled the pretrial conference on his own, and researched and composed all first drafts of the various pretrial briefs. With this level of attention to conserving resources, and the aggravating factors imposed by Mr. Sisson's dilatory and obstructionist tactics, the Court concludes that the time expended was entirely reasonable and the costs commensurate with necessary preparation.[12]

_____

[11] One flaw in the paralegal assistance came in checking the final post-trial brief against the trial transcript and exhibits. The cites were almost entirely in error and were of no assistance to the Court, which was required to task its own staff to comb the record to provide accurate citations to testimony and exhibits. The Court will not require Mr. Sisson to pay any of the $5,562.50 in fees charged for cite-checking the brief. Pl.'s App. Exh. A Attach. 2, CW 2267-68, Index ## 2102043, 2106825, 2106772, 2106785, 2108481, 2110235.

[12] For these reasons, Mr. Sisson's argument that Ms. Wilcox made no attempt to control litigation costs is rejected. His argument is really a re-run of his first argument concerning Ms. Wilcox's choice of counsel. *See* Defs.' Opp'n at 8 ("Plaintiff's choice of law firm clearly indicates a desire to escalate costs. As noted above, Williams & Connolly is a law firm that typically represents large corporations . . . ."). It fares no better the second time around. Mr. Sisson's complaint that both Mr. Zweifach and Mr. Mital attended the deposition of Richard Frank, Ms.

C. Hail Mary Pass

In what Ms. Wilcox describes as a "Hail Mary" pass, Mr. Sisson last argues that the special warranty he breached was not an amendment to the sales contract and is not subject to the fee-shifting provision of that contract.  This argument has no merit.

Paragraph 23 of the sales agreement shifted attorneys' fees to the winner in the event of "any action or proceeding" arising thereunder.  *See supra* n.1.  When her home inspector later identified some problems with the house, Ms. Wilcox sought, and Mr. Sisson provided, a letter containing specific warranties.  In a letter dated May 15, 2001, "RE: Contract of Sale May 4, 2001 for 4815 Dexter Street NW, WDC 20007," Mr. Sisson stated, *inter alia*, that

> 7.  Seller accepts responsibilities for warranties to the home that will survive settlement as follows:
>
> A.  For five years from settlement, that the Residence is free from structural defects.
>
> B.  For two years from settlement (but, in the case of appliances, not greater than the scope and length of the manufacturer's warranty) that the Residence is free from any defect in electrical, plumbing, heating, cooling, and ventilating systems.
>
> C.  For one year from settlement, that the residence is free from any defects in materials and workmanship.

Pl.'s Exh. 6 ("Warranty Letter") ¶ 7.  The house failed to measure up to a single one of these warranties.  Mem. Op. at 23-29 (structural), 29-32 (heating and cooling), 32-34 (plumbing), and 34-

Wilcox's contractor who identified and corrected the flaws in the Dexter Property, falls flat.  Mr. Frank was a critical witness, prepared by Mr. Mital for his deposition testimony, but necessary for Mr. Zweifach to observe at deposition and in preparation for putting Mr. Frank on the stand at trial. Given the reliance Mr. Zweifach placed on Mr. Mital to handle the preparation of the case, with its resulting efficiencies (and success), the Court does not fault Williams & Connolly for having both lawyers attend particularly crucial depositions.

35 (electrical).

Mr. Sisson would now have the Court find that this Warranty Letter was a stand-alone document unconnected to the sales agreement and not governed by fee-shifting provision. This defense has never before been advanced in any pretrial, trial, or post-trial argument or brief. The totality of Mr. Sisson's argument is contained in one short paragraph in his brief:

> The letter containing the warranties that forms a basis for this lawsuit was not part of the Sales Contract. Nowhere in that letter do the parties state that the warranties are incorporated into the Sales Contract. *See* PX 6. Nor does the letter contain a fee shifting provision. *Id.* Because (1) the letter was not incorporated into the Sales Contract, and (2) the letter does not contain a fee shifting provision, Plaintiff should not be permitted to recover attorneys' fees based on her successful litigation of the warranty claims.

Defs.' Opp'n at 15-16. Since there is no record testimony on this point and Mr. Sisson points to no evidentiary or legal support beyond the documents themselves, the Court interprets his argument to be based on a "plain reading" of the sales contract and Warranty Letter. The Warranty Letter, however, specifically stated that it was regarding ("RE") the Contract of Sale and was written "[p]ursuant to the letter from A. Lee Lundy, Jr. attorney representing purchaser Cynthia Wilcox." Mr. Lundy's letter, of course, had warned that Ms. Wilcox would not proceed to settlement unless architectural plans, building permits, and manufacturers' literature were provided, certain repairs completed, and certain warranties provided. Thus, by its own terms, the Warranty Letter was tied to the Contract of Sale and its scope is not as "plain" as Mr. Sisson's argument suggests.

Indeed Mr. Sisson's real estate agent, who prepared the Warranty Letter, stated that it was a "contract addendum." Pl.'s Resp. to Defs.' Pretrial Brief Exh. 16 ¶ 2. Mr. Sisson argued in his motion for partial summary judgment on Count II that he disputed whether there was

"consideration for the *contractual modification* of additional warranties," Defs.' 12/9/03 Mem. at 2 (emphasis added).  And at trial, Mr. Sisson admitted that a breach of any of the warranties would be enforceable in an action in which he would have to "pay reasonable attorney costs for you to pursue the matter if you are disappointed in my work."  Transcript 8/25/04 a.m. (Sisson) at 31.

      In denying Mr. Sisson's motion for partial summary judgment, the Court adopted this terminology and found that the "contractual modification add[ed] additional warranties to the sales contract."  1/13/04 Mem. Op. at 2.  In its post-trial findings of fact, the Court found that, "as amended [by the Warranty Letter], the sales contract on the Dexter Property included a fee-shifting provision."  Mem. Op. at 49.  For this reason, the Court has already determined that Ms. Wilcox is "entitled to an award of reasonable attorneys' fees in an amount to be determined."  *Id.* at 65.

      Ms. Wilcox argues that Mr. Sisson's Hail Mary pass is precluded by these prior findings of the Court, and that the status of the Warranty Letter as an addendum to, and part of, the sales agreement is the law of the case.  The Court agrees.  But whether as a matter of law, fact, or direct concession from Mr. Sisson, the result is the same: In suing successfully for breach of the warranties, Ms. Wilcox is entitled to the benefit of the fee-shifting provision in the sales contract.

      D.  Other Litigation Expenses

      Williams & Connolly has also charged Ms. Wilcox for various litigation expenses, ranging from administrative charges for photocopies and transcripts to fees paid to experts.  While the parties agree that the former are reimbursable as "attorneys' fees" as that phrase is defined in *Missouri v. Jenkins*, 491 U.S. 274, 285 (1989), they disagree over whether expert witness fees are recoverable.  District of Columbia law governs the issue.  *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 259 n.31 (1975) (noting that federal courts sitting in diversity apply state law

with respect to attorneys' fees issues), *superseded by statute on other grounds as stated in Moore v. Permanente Med. Group*, 981 F.2d 443, 446 (9th Cir. 1992).

The District follows the "American Rule" on attorneys' fees, by which "the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Sundown Inc. v. Canal Square Assocs.*, 390 A.2d 421, 430 (D.C. 1978) (citing *Alyeska Pipeline*, 421 U.S. at 247). "A valid contract provision, however, can authorize an attorneys' fees award." *Id.* at 430. Neither party contests these principles. The narrow question at issue is whether the parties' contract, which explicitly provides for the recovery of attorneys' fees, also allows for recovery of expert expenses billed to the law firm and paid by the firm in the normal course of its representation. Finding the issue a debatable one, the Court directed the parties to submit simultaneous supplemental briefs addressing "whether the Sales Agreement, as amended by the Warranty, provides for the recovery of Plaintiff's expert witness fees." The Court is persuaded that it does not.

Where, as here, "a contractual agreement expressly provides for the payment of attorney's fees, the trial court's discretion is limited to ascertaining what amount constitutes a 'reasonable' fee award. Otherwise put, absent public policy considerations or other unusual circumstances, the duty of the trial court is to give meaning to the full agreement of the parties, as interpreted by controlling case law." *Cent. Fid. Bank v. McLellan*, 563 A.2d 358, 360 (D.C. 1989). (citing *Bolgiano & Co. v. Brown*, 333 A.2d 674, 675 (D.C. 1975)). Thus, the Court's role here is fundamentally one of contract interpretation. Paragraph 23 of the Sales Agreement provides:

> **ATTORNEY'S FEES.** In any action or proceeding involving a dispute between the Purchaser and the Seller arising out of this Contract, the prevailing party will be entitled to receive from the other party *reasonable attorney's fees* to be determined by the court or arbitrator(s). In the event a dispute arises resulting in the Broker

> being made a party to any litigation or if the Broker is required to
> bring litigation to collect the Broker's Fee, the Purchaser and Seller
> agree to indemnify the Broker, its employees, and/or licensees for *all
> attorney['s] fees and costs of litigation*, unless the litigation results
> in a judgment against the Broker, its employees and/or licensees.

Sales Agt. ¶ 23 (emphasis added) [Dkt. #107, Exh. 17].  Mr. Sisson argues that this provision draws

a clear distinction between those fees and costs available in litigation involving the broker versus

those available in actions between the buyer and seller alone.  Where the broker is not a party to the

litigation, as is the case here, the prevailing buyer or seller may collect "reasonable attorney's fees."

*Id.*  But where the broker is a party, it is entitled to "all attorney['s] fees and costs of litigation" if

it prevails.  *Id.*  Because there must be some significance to this different language, Mr. Sisson

submits, a buyer prevailing in litigation between the buyer and seller alone is not entitled to be

reimbursed for "costs of litigation."  Mr. Sisson argues that expert witness fees fall under the

umbrella of costs, not attorneys' fees, and are therefore not compensable.  Ms. Wilcox, on the other

hand, argues that expert fees are a quintessential part of attorney's fees, and are thus recoverable —

whether or not the broker is involved in the action — when they are "the type[] of expenses typically

paid by counsel and then billed to the client." Pl.'s Supp. Mem. at 2.  The question, therefore, is this:

Did the parties intend that expert fees would be treated as "attorneys' fees" or as "costs of

litigation"?

Mr. Sisson finds some support for his position in *West Virginia University Hospitals

Inc. v. Casey*, 499 U.S. 83 (1991), *superceded by statute as stated in Landgraf v. USI Film Prods.*,

511 U.S. 244, 251 (1994).  In *Casey*, the Court considered whether a fee-shifting provision in 42

U.S.C. § 1988 that allows a prevailing party to recover "a reasonable attorney's fee as part of the

costs" covered expert fees in excess of those allowed by 28 U.S.C. §§ 1920(3) and 1821(b).[13]

Recognizing that the limits of §§ 1920(3) and 1821(b) must hold "absent contract or explicit

statutory authority to the contrary," the Court emphasized that it would "not lightly infer that

Congress ha[d] repealed §§ 1920(3) and 1821(b) . . . through any . . . provision not referring

explicitly to witness fees." *Id.* at 86-87 (citing *Crawford Fitting Co. v. J.T. Gibbons Inc.*, 482 U.S.

437, 439, 445 (1987)).

        In its search for such "explicit statutory authority," the Court first reviewed a host of

fee-shifting statutes, and found that while "some . . . refer only to 'attorney's fees,' many others

explicitly shift expert fees as well as attorney's fees." *Id.* at 88 (citations omitted).  Convinced by

the record of statutory usage that expert fees are "referred to *in addition to* attorney's fees when a

shift is intended," *id.* at 90, the Court concluded that "attorney's fees and expert fees are distinct

items of expense," *id.* at 92.  A contrary reading, it said, would make surplusage out of any

references to expert fees in the statutes that explicitly provided for them.  *See id.*  The Court next

looked to judicial usage, finding that the "judicial background against which Congress enacted

§ 1988 mirrored the statutory background: Expert fees were regarded not as a subset of attorney's

fees, but as a distinct category of litigation expense." *Id.*  In sum, the *Casey* Court found that the

plain language of § 1988, read *in pari materia*, must prevail: "Congress could easily have shifted

'attorney's fees and expert witness fees' or 'reasonable litigation expenses,' as it did in

---

[13] As the *Casey* Court explained, 28 U.S.C. § 1920(3) provides in part that "[a] judge or clerk of any court of the United States may tax as costs . . . [f]ees and disbursements for printing and witnesses." *Casey*, 499 U.S. at 86 (quoting 28 U.S.C. § 1920).  Title 28 U.S.C. § 1821(b), in turn, "limits the witness fees authorized by § 1920(3) as follows: 'A witness shall be paid an attendance fee of $30 per day for each day's attendance.  A witness shall also be paid the attendance fee for the time necessarily occupied in going to and returning from the place of attendance.' " *Id.* (quoting 28 U.S.C. § 1821).  This attendance fee has since been raised to $40 per day.  28 U.S.C. § 1821(b).

contemporaneous statutes; it chose instead to enact more restrictive language, and we are bound by that restriction." *Id.* at 99.

The D.C. Circuit recently followed *Casey* in *Goldring v. District of Columbia*, 416 F.3d 70 (D.C. Cir. 2005), in which it considered whether the Individuals with Disabilities Education Act's fee-shifting provision, which permits a prevailing parent to recover "reasonable attorneys' fees as part of the costs," 20 U.S.C. § 1415(i)(3)(B), encompasses expert fees. *Goldring*, 416 F.3d at 71-72. The D.C. Circuit held that "because section 1415 and the version of section 1988 construed in *Casey* contain materially identical language and *Casey* held that section 1988's language does not enable a prevailing party to shift his expert fees, we cannot but conclude that section 1415 does likewise. That is the end of the matter for us." *Id.* at 74. Mr. Sisson argues that *Casey* and *Goldring* should be "the end of the matter" for this Court as well. *See* Defs.' Supp. Mem. at 3.

*Casey* and *Goldring* differ critically from this case, however, in that here the Court is faced with a question of contract interpretation, not statutory interpretation; therefore, the central question is not what Congress intended, but what the parties intended. Although the *Casey* Court undoubtedly found the phrase "attorney's fees" unambiguous, it did so in view of Congress's "record of statutory usage" and the "judicial background against which Congress []acted." *Casey*, 499 U.S. at 88, 92; *see id.* at 98 (considering a statutory phrase "unambiguous" where it "has a clearly accepted meaning in both legislative and judicial practice"); *Goldring*, 416 F.3d at 77 (same). When dealing with a contract rather than a statute, however, Congress's background understanding is only helpful, if at all, to the extent that it illuminates the parties' intent. Moreover, the high bar to finding the implicit repeal of a statute, *see Casey*, 499 U.S. at 86-87 (citing *Crawford Fitting*, 482 U.S. at 445), is not implicated under these circumstances. Thus, *Casey* and *Goldring* are of little assistance

-22-

in revealing the parties' intent, and do not necessarily control the outcome here.

Ms. Wilcox, on the other hand, relies principally on two other cases to support her position. She first argues that *Sundown Inc. v. Canal Square Associates*, 390 A.2d 421, 432 (D.C. 1978), "awarded expert fees as part of attorneys' fees in a breach of contract action," Pl.'s Supp. Mem. at 2. Ms. Wilcox misreads *Sundown*. In *Sundown*, the D.C. Court of Appeals interpreted a lease provision that gave a tenant the right, in the event that its landlord failed to meet its obligations, "to perform the [l]andlord's obligations under the [l]ease and to be reimbursed for its expenses incurred in so doing." *Sundown*, 390 A.2d at 429-30. The lease did not specify what "expenses" were recoverable; the tenant claimed "attorneys' fees, acoustical experts' fees, employees' time, court costs, and miscellaneous expenses." *Id.* at 430. The landlord challenged only the trial court's award of attorneys' fees. *Id.* The D.C. Court of Appeals affirmed the award, viewing the lease as providing for nonrestrictive reimbursement of "all expenses" incurred in performing the landlord's obligations. *Id.* at 431-32. Thus, while *Sundown* holds that "attorneys' fees" may be considered an "expense," and suggests that "expert fees" may likewise be considered an "expense," it assuredly does not say that "expert fees" are properly treated as part of "attorneys' fees."

Ms. Wilcox last relies on *Missouri v. Jenkins*, 491 U.S. 274 (1989), in which the Court, two years before its decision in *Casey*, considered whether the same provision of 42 U.S.C. § 1988 it confronted in *Casey* — "a reasonable attorney's fee as part of the costs" — authorizes compensation for the work of paralegals as well as that of attorneys. *Jenkins*, 491 U.S. at 284-85. In beginning its analysis, the Court stated:

> Clearly, a "reasonable attorney's fee" cannot have been meant to compensate only work performed personally by members of the bar. Rather, the term must refer to a reasonable fee for the work product

of an attorney. Thus, the fee must take into account the work not only of attorneys, but also of secretaries, messengers, librarians, janitors, and others whose labor contributes to the work product for which an attorney bills her client; and it must also take account of other expenses and profit.

*Id.* at 285. It then took "as [its] starting point the self-evident proposition that the 'reasonable attorney's fee' provided for by statute should compensate the work of paralegals, as well as that of attorneys" and moved on to the "more difficult question" of "how the work of paralegals [should] be valuated in calculating" that fee. *Id.* Because a "reasonable attorney's fee under § 1988 is one calculated on the basis of rates and practices prevailing in the relevant market," it concluded that the "increasingly widespread custom of separate billing for the service of paralegals and law students who serve as clerks must be taken into account." *Id.* at 286. Alone in dissent from this portion of the Court's opinion was Chief Justice Rehnquist, who criticized this logic as paving the way for "prevailing parties [to] recover at market rates for the cost of secretaries, private investigators, and other types of lay personnel who assist the attorney in preparing his case, so long as they could show that the prevailing practice in the local market was to bill separately for these services." *Id.* at 296 (Rehnquist, C.J., dissenting).

Two years later in *Casey*, however, the Court arguably reinterpreted its holding in *Jenkins*, stating that the earlier case "involved a respect in which the term 'attorney's fees' . . . was genuinely ambiguous; and we resolved that ambiguity not by invoking some policy that supersedes the text of the statute, but by concluding that [paralegal fees] had traditionally been included in attorney's fees and that separate billing should make no difference." *Casey*, 499 U.S. at 100. It continued: "The term's application to expert fees is not ambiguous; and if it were[,] the means of analysis employed in *Jenkins* would lead to the conclusion that since such fees have not traditionally

been included within the attorney's hourly rate they are not attorney's fees." *Id.*

The Court concludes that, under these circumstances, the "full agreement of the parties" to shift reasonable attorneys' fees to the prevailing party does not extend to expert fees. *See Cent. Fid. Bank*, 563 A.2d at 360 (stating standard). While the phrase "attorneys' fees" arguably admits of some ambiguity in the context of a contract rather than a statute, the plain language of the Sales Agreement alone is insufficient to convince the Court that by saying "attorneys' fees" the parties intended to include "expert fees." Moreover, Plaintiff has failed to establish — as opposed to assert — that pass-through billing of expert fees is now customary. See Pl.'s Supp. Mem. at 1. Specifically, Plaintiff has made no effort to establish that expert fees have "traditionally been included in the attorney's hourly rate," *Casey*, 499 U.S. at 100, or that "the prevailing practice in the local market [is] to bill separately for these services." *Jenkins*, 491 U.S. at 296 (Rehnquist, C.J., dissenting).

It is "the fee applicant [that] bears the burden of establishing entitlement to an award." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983); *Covington v. District of Columbia*, 57 F.3d 1101, 1107 (D.C. Cir. 1995). Plaintiff has not met that burden with respect to her expert fees. The Court will therefore not award expert fees for the services of Mr. Edelson ($20,322.30, *see* Pl.'s Exh. A Attach. 5), Mr. Lofgren ($11,404.30, *see* Pl.'s Exh. A Attach. 6), and Mr. Burr ($3,750, *see* Pl.'s Exh. A Attach 7), in the sum of $35,476.60. Recognizing, however, that Mr. Edelson testified at trial on two days (8/19/04 and 8/20/04), and that Messrs. Lofgren and Burr each testified on one day (both on 8/23/04), the Court will award expert witness costs in the amount of $160 as provided by 28 U.S.C. §§ 1920(3) and 1821(b). Thus, it will deduct $35,316.60 from Plaintiff's fee request.

## IV. CONCLUSION

Pursuant to the sales agreement, Ms. Wilcox is entitled to an award of reasonable attorneys' fees.  The Court finds that the rates and hours charged by Williams & Connolly LLP were reasonable under these circumstances and enters an award in the amount of $775,319.83, which reflects Ms. Wilcox's request of $816,198.93, less $5,562.50 for certain work by a legal assistant, *see supra* n.11, and less $35,316.60 in expert fees for the services of Messrs. Edelson, Lofgren, and Burr, *see supra* Part III.D.  Plaintiff's Third Supplement to her fee application [Dkt. #204] remains outstanding.  A memorializing order accompanies this memorandum opinion.

Date: May 25, 2006                                          _____/s/_____
                                                            ROSEMARY M. COLLYER
                                                            United States District Judge